Morgan E. Pietz (SBN 260629)
THE PIETZ LAW FIRM
3770 Highland Avenue, Suite 206
Manhattan Beach, CA 90266
mpietz@pietzlawfirm.com
Telephone: (310) 424-5557
Facsimile:  (310) 546-5301

Drew E. Pomerance (SBN 101239)
Anne S. Kelson (SBN 257851)
Jesse B. Levin (SBN 268047)
ROXBOROUGH, POMERANCE, NYE & ADREANI
5820 Canoga Avenue, Suite 250
Woodland Hills, CA 91367
dep@rpnalaw.com
ask@rpnalaw.com
jbl@rpnalaw.com
Telephone: (818) 992-9999
Facsimile:  (818) 992-9991

*Attorneys for Plaintiff John Blaha,*
*Individually and on Behalf of Others Similarly Situated*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| John Blaha,* individually and on behalf of others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> Rightscorp, Inc., a Nevada corporation, f/k/a Stevia Agritech Corp.; Rightscorp, Inc., a Delaware corporation; Christopher Sabec; Robert Steele; Craig Harmon; Dennis J. Hawk; BMG Rights Management (US) LLC; Warner Bros. Entertainment Inc.; and John Does 1 to 10, <br><br> Defendants. <br><br> [*Previously captioned with Karen J. Reif and Isaac Nesmith as lead plaintiffs] | Case No.: 2:14-cv-9032-DSF-(JCGx) <br><br> Assigned to: Hon. Dale S. Fischer United States District Judge <br><br> Referred to: Hon. Jay C. Gandhi United States Magistrate Judge <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT FOR:** <br><br> (1) Violations of the Telephone Consumer  Protection Act (47 U.S.C. § 227) <br><br> (2) Abuse of Process (Under Federal and California Law) <br><br> **AND DEMAND FOR JURY TRIAL** |

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

Plaintiff John Blaha, individually and on behalf of others similarly situated ("**Plaintiff**"), brings this class action complaint against defendants Rightscorp, Inc., a Nevada corporation, formerly known as Stevia Agritech Corp., and Rightscorp, Inc., a Delaware corporation (together, "**Rightscorp**"); Christopher Sabec, Robert Steele, Craig Harmon, and Dennis J. Hawk, who are all individuals (the "**Individual Defendants**"); and clients of Rightscorp, namely BMG Rights Management (US) LLC; Warner Bros. Entertainment Inc.; and John Does 1 to 10, and hereby allege as follows:

## NATURE OF THE CASE

1.     Rightscorp describes itself to investors as a "leading provider of monetization services" for copyright owners.  Rightscorp's business model involves using federal legal process and the threat of statutory damages for copyright infringement to engage in what some call "speculative invoicing" of consumers who it accuses of having engaged in file sharing.

2.     As part of its ongoing efforts to leverage "settlements" for purported claims of copyright infringement from consumers, Rightscorp has unlawfully made extensive and repeated use of an automatic telephone dialing system and/or a prerecorded or artificial voice (a "**Robo-Caller**"), to call Plaintiff on his cell phone, in violation of the Telephone Consumer Protection Act (47 U.S.C. § 227) ("**TCPA**").

3.     To identify potential consumers to target, Rightscorp has willfully misused this Court's subpoena power by issuing at least 142 special DMCA subpoenas, per 17 U.S.C. § 512(h), to various Internet Service Providers ("**ISPs**"). These subpoenas, which were issued on this Court's authority, but procured outside of an adversarial proceeding and without any judicial review, are so clearly legally invalid as to be a sham and abuse of the legal process.  Rightscorp has known since at least 2012, when its issuance of DMCA subpoenas was challenged in this Court, that current law does not allow the DMCA subpoena procedure it wished to utilize.

-2-

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

*See* <u>Telscape Comm's, Inc. v Rightscorp, Inc.</u>, C.D. Cal. No. 2:2012-cv-8833-JSF-(JCGx), ECF No. 12, 11/8/2012 (Fischer, J.) (granting ISP's motion to quash Rightscorp DMCA subpoena after Rightscorp failed to oppose).  Despite conceding its position and declining to argue that the law should be changed back in 2012, Rightscorp continued to obtain DMCA subpoenas—at least 142 of them—from the Clerk of this Court, and continued to serve them on smaller to medium-sized ISPs[1]. More recently, after a Texas ISP again moved to quash one of the 142 DMCA subpoenas issued on this Court's authority, Rightscorp withdrew that subpoena, again seeking to avoid judicial review of its plainly unlawful use of this Court's subpoena power.  *See* <u>In re Subpoena Issued to Grande Com'n. Net's., LLC</u>, W.D. Tx. No. 1:14-mc-00848, ECF No. 3, 9/10/14 (notice to court that Rightscorp withdrew its subpoena); *see also* <u>id</u>. at ECF No. 1, 9/5/14 (ISP's motion to quash). Nevertheless, even after tacitly conceding its position and declining to argue for a change in the law a second time, Rightscorp continued to issue dozens of new DMCA subpoenas to ISPs on this Court's authority thereafter.  *See, e.g.,* <u>In re Subpoena Issued to US Internet Corp.</u>, C.D. Cal. No. 2:14-mc-864-UA, 10/14/14.

    4.    Accordingly, Plaintiff prays for class relief against all defendants, including damages under the TCPA, punitive damages for abuse of process, in addition to compensatory and special damages, restitution, attorneys' fees, costs, and injunctive relief to stop Rightscorp's unlawful practices, including its continued issuance of sham DMCA subpoenas.

## PARTIES

    5.    Plaintiff John Blaha is an individual residing in Cedar Rapids, Iowa.

    6.    Defendant Rightscorp, Inc. is a Nevada corporation with its headquarters and principal place of business located within the Western Division of

---

[1] Rightscorp knew better than to issue such subpoenas to large ISPs, which would have refused to comply with them and/or moved to quash them, since the largest ISPs, which have in-house legal departments focused on subpoenas, all know that DMCA subpoenas are clearly invalid as to them.

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

this Judicial District at 3100 Donald Douglas Loop North, Santa Monica, CA 90405 ("**Rightscorp Nevada**").  On information and belief, prior to July 15, 2013, Rightscorp Nevada was formerly known as Stevia Agritech Corp.

7.     Defendant Rightscorp, Inc. is a Delaware corporation with its headquarters and principal place of business located within the Western Division of this Judicial District at 3100 Donald Douglas Loop North, Santa Monica, CA 90405 ("**Rightscorp Delaware**").  On information and belief, Rightscorp Delaware is a wholly owned subsidiary of Rightscorp Nevada.

8.     On information and belief, there existed and there continues to exist a unity of interest between Rightscorp Nevada and Rightscorp Delaware, such that any individuality and separateness between them has ceased, and the two companies are alter egos of one another.  On information and belief, one of the companies has complete control and domination over the business and financial dealings of the other company.  Adherence to the fiction of a separate existence of the two Rightscorp companies would be an abuse of limited liability protection and would promote injustice such that the two entities should be treated as one and the corporate veil between them should be pierced.

9.     Defendant Christopher Sabec, an individual, is the CEO of Rightscorp. On information and belief, he resides within the Central District of California.  Mr. Sabec is also an attorney.

10.     Defendant Robert Steele, an individual, is the CTO and COO of Rightscorp.  On information and belief, he resides within the Central District of California.

11.     Defendant Craig Harmon is, on information and belief, the "General Counsel" of Rightscorp and a member of the company's "management."

12.     Together, Mr. Sabec, Mr. Steele, and Mr. Harmon are the "**Management Defendants**."

-4-

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

13.     Defendant Dennis J. Hawk, an individual, is an attorney who, like Rightscorp, also maintains his office at 3100 Donald Douglas Loop North, Santa Monica, CA 90405.  Mr. Hawk purports to be affiliated with the "Business Law Group".  Mr. Hawk signed and filed the "Declaration[s] Pursuant to 17 U.S.C. § 512(h)" that were used to obtain the clerk-stamped DMCA subpoenas that underlie the abuse of process claim, as more fully alleged below.

14.     Defendant BMG Rights Management (US) LLC is a Delaware limited liability company ("**BMG**").  On information and belief, BMG is a client of Rightscorp and it maintains a principal place of business at 1745 Broadway, New York, NY 10019.  On information and belief, Rightscorp was acting on behalf of BMG, as its actual and ostensible agent, in doing the wrongful acts alleged in this complaint.  BMG has admitted in a court pleading filed in the Eastern District of Virginia that Rightscorp was its agent in certain relevant respects.

15.     Defendant Warner Bros. Entertainment Inc. is a Delaware corporation ("**Warner Bros.**").  On information and belief, Warner Bros. is a client of Rightscorp and it maintains a principal place of business at Warner Brothers Studios, 3400 Riverside Drive, Burbank, CA 91522.  On information and belief, Rightscorp was acting on behalf of Warner Bros., as its actual and ostensible agent, in doing the wrongful acts alleged in this complaint.

16.     Defendants John Does No. 1 to 10 are other unknown clients of Rightscorp, on whose behalf Rightscorp was acting, as an actual and ostensible agent, in doing the wrongful acts alleged in this complaint.  The true identities of the John Doe defendants are presently unknown to Plaintiff but can be ascertained through discovery.  Plaintiff will amend the complaint to include the true names of the appropriate John Doe defendants after their identities have been ascertained.

17.     The John Doe defendants, together with BMG, and Warner Bros., are the "**Rightscorp Clients**."

-5-

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

18.     Together, Rightscorp, the Individual Defendants, and the Rightscorp Clients are the "**Defendants**."

## JURISDICTION AND VENUE

19.     This Court has federal question subject matter jurisdiction over the TCPA cause of action, which clearly arises under federal law, pursuant to 28 U.S.C. § 1331.  *See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740 (2011) (TCPA claims are subject to federal question jurisdiction).

20.     This Court also has federal question subject matter jurisdiction over the abuse of process cause of action, per 28 U.S.C. §§ 1331 and 1338, because "even though state law creates [Plaintiff's] cause of action" for abuse of process, the cause of action still '"arise[s] under' the laws of the United States" because this "well-pleaded complaint establish[es] that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." *See Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 13, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983).  Specifically, the adjudication of the abuse of process cause of action requires this Court to determine whether the 142 DMCA subpoenas Rightscorp has issued comply with federal copyright law as enunciated at 17 U.S.C. § 512(h) *et seq.*, and whether this Court's federal legal process has been abused.

21.     In the alternative, this Court has supplemental subject matter jurisdiction over the abuse of process cause of action, per 28 U.S.C. § 1367, because the abuse of process is so related to the other federal claim as to form part of the same case or controversy under Article III of the U.S. Constitution.

22.     This Court has personal jurisdiction over the defendants Rightscorp Nevada and Rightscorp Delaware because they have their principal headquarters in Santa Monica, CA, and regularly conduct business in the State of California.

23.     Each of the Individual Defendants have continuous and systematic contacts with the State of California, by virtue of their close involvement with

-6-

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Rightscorp, such that this Court has personal jurisdiction over them.  On information and belief, Mr. Sabec, Mr. Steele, and Mr. Hawk also reside within the State of California.

24.     Mr. Harmon purposefully established significant contact with the State of California by doing repeated, "general counsel" type work for Rightscorp, which he knew was based in California.  On information and belief, Mr. Harmon purposefully entered into a contract with Rightscorp, which is activity directed at this forum, and which created continuing obligations between himself and Rightscorp, a resident of this forum.  On information and belief, Mr. Harmon advised Rightscorp as to activity that he knew would be conducted in California, and would have an effect on residents of the State of California. Further, the claims against Mr. Harmon arise directly out of his work for Rightscorp.  In addition, on information and belief, Mr. Harmon files a tax return in the State of California every year.

25.     On information and belief, this Court has personal jurisdiction over each of the Rightscorp Clients because they have continuous and systematic business contacts with the State of California.  In addition, the activities of the Rightscorp Clients, namely their purposeful engagement of Rightscorp to act as their agent to perform services within California that would have an effect on residents of the State of California, specifically gave rise to the claims at issue.

26.     Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(b)(1) and (b)(2), because Rightscorp resides in this judicial district, and a substantial part of the events giving rise to the claim, including the issuance of invalid subpoenas, and the making of Robo-Calls, occurred in and originated from this judicial district.

27.     Assignment within this judicial district to the Western Division is appropriate, because defendant Rightscorp resides in Santa Monica, CA, which is in the Western Division.

-7-

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

## COMMON FACTUAL ALLEGATIONS

**(a)   Background on Rightscorp's Copyright "Settlement" Business**

28.   According to a September 2014 marketing presentation Rightscorp included in its Securities and Exchange Commission disclosures, Rightscorp describes its business as follows:

> "Rightscorp is a leading provider of monetization services for artists and holders of copyrighted Intellectual Property (IP). The Company has a patent-pending, proprietary technology for solving copyright infringement by collecting payments from illegal distributors via notifications sent to their Internet Service Providers (ISPs)."

29.   Rightscorp's "proven" solution to collect payments from "infringers" has four steps: "[1] Crawl P2P networks such as BitTorrent accessed by The Pirate Bay; [2] Send automated settlement offers to infringers via their ISPs for $20 per infringement vs. $150,000 legal liability per infringement if they do not settle; [3] Identify non-responsive repeat infringers; [4] ISPs can terminate repeat infringers to reduce ISP's potential liability."

30.   Rightscorp collects "daily payments from infringers accepting settlement offers" on which there is a "50/50 Split on collections to copyright holders."  Rightscorp claims to have "closed over 100,000 cases on 140+ ISPs to date;" it has "80,000+ copyrights active in our system;" and it "[r]ecently received approval to collect on over 1.5 million copyrights."

31.   According to Rightscorp's 2013 10-K report dated March 25, 2014, in the section that explains how revenue is recognized, Rightscorp "generates revenue from the sale of a service to copyright owners under which copyright owners retain the Company to identify and collecting [sic] settlement payments from Internet users who have infringed on their copyrights. Revenue is recognized when the ISP's subscriber pays the fee [.]"

32.   Also according to the 2013 10-K Report, one of the "touch points" for Rightscorp's "Growth Strategy" was to grow revenue, "[b]y increasing response

-8-

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

rates (the number of subscribers who have received notices and agree to settle.) We may seek to do this through public relations, through examples in the press of infringers who were sued by copyright owners, by improving the educational and motivational aspects of the notice, web site and payment process and by having ISP's terminate repeat infringers until they settle."

33.     Rightscorp further explained in its 2013 10-K that "[u]nder our business model, the copyright owner signs a simple agreement authorizing us to monitor the P2P networks and collect settlement payments on its behalf."

34.     Notably absent from Rightscorp's 10-K and from other similar securities filings is any claim that it has taken assignment to any copyrights, or secured an exclusive license to any of the copyrighted content in its "monetization system." Rather, Rightscorp's investor materials discuss threatening ISP subscribers with disconnection of their Internet service if they refuse to pay on claims for alleged infringement supposedly owed to third party content owners.

35.     Accordingly, Plaintiff is informed and believes that Rightscorp is not the owner or exclusive licensee for any of the copyright rights that it has "ingested" into its "proprietary copyright monetization system."  Rather, Plaintiff is informed and believe the copyright rights Rightscorp seeks to "monetize" are owned and/or exclusively licensed by third-party content creators who are Rightscorp's clients. Thus, Plaintiff is informed and believe that Rightscorp actually has no standing or legal right to sue anyone for copyright infringement in relation to the copyrights it has "ingested" into its "monetization" system.

36.     Rightscorp emails settlement offer to consumers' ISPs, which Rightscorp asks the ISPs to forward to their subscribers.  Rightscorp's "**Sample Settlement Offer**" is described by Rightscorp in a slide from its September 2014 investor presentation, as follows:

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

Sample Settlement Offer

37.     By clicking on a link that purports to redirect to a "secure" payment site, consumers who receive emails similar to the foregoing "Sample Settlement Offer" are invited to pay by credit card or other means to "settle" a copyright infringement claims against them.  As Rightscorp explains in its 2013 10-K,

> "The user who receives the notice reads that they could be liable for $150,000 in damages, but if they click on the link supplied, they can enter a credit card and they can will settle the matter between them and the copyright owner for $20 per music infringement."

**(a)     Rightscorp's Issuance of Special DMCA Subpoenas From This Court Per 17 U.S.C. § 512(h)**

38.     As a representative example, on August 14, 2014, attorney Dennis J. Hawk filed three case-initiating documents in the U.S. District Court for the Central

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

District of California, in case number 2:14-mc-635-UA:

(a)     A "Declaration Pursuant to 17 U.S.C. § 512(h)[2]", a true and correct copy of which is attached hereto as **Exhibit A** (C.D. Cal. No. 14-mc-635-UA, ECF No. 1).  The declaration recited that Mr. Hawk was a California attorney "associated with Businesses Law Group ("Business Law Group"), counsel for Rightscorp, Inc. ("Rightscorp"), a representative of various copyright owners. Business Law Group is authorized to act on behalf of Rightscorp and the copyright owners it represents on matters involving infringement of their copyrighted sound recordings.  This declaration is made in support of the accompanying Subpoena. . ."

(b)     A "Notice of Lodging of Summary Spreadsheet and DMCA Notifications," a true and correct copy of which is attached hereto as **Exhibit B** (C.D. Cal. No. 14-mc-635-UA, ECF No. 2).  The notice specified that two documents were included on a CD lodged with the Court (but which are not available on PACER): (i) "Excel Summary Spreadsheet"; and (ii) "Notices from June 7, 2014 to August 6, 2014".

(c)     A "Subpoena to Produce Documents, Information, or Objects, or to Permit Inspection of  Premises in a Civil Action," a true and correct copy of which is attached hereto as **Exhibit C** (C.D. Cal. No. 14-mc-635-UA, ECF No. 3). The subpoena contained the Seal of the U.S. District Court for the Central District of California and was stamped by a deputy clerk as of August 14, 2014.  The subpoena was directed to Greenfield Communications, Inc. ("**Greenfield**") and demanded production of "Information, including name, address, telephone number, and email address sufficient to identify the alleged infringers of copyrighted sound recordings, identified by IP addresses in the notices attached as Exhibit A to this subpoena." No "Exhibit A" was actually attached to the version of the subpoena e-filed with this

---

[2] 17 U.S.C. § 512(h) was added to the Copyright Act by a subpart of the Digital Millennium Copyright Act of 1998 ("**DMCA**") called the Online Copyright Infringement Liability Limitation Act.  Section 512 often is referred to as the "safe harbor" provision of the DMCA.

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Court.  The subpoena demanded production of the requested information by September 15, 2014.

39.     On information and belief, Greenfield is an ISP based in Dana Point, California, that provides cable and fiber optic Internet services to residential Internet subscribers, and is not one of the nation's top ten largest ISPs.

40.     There are at least 141 other, similar sets of subpoena papers that Mr. Hawk has filed in the Central District of California on behalf of Rightscorp and its clients.  A PACER report showing each of Rightscorp's miscellaneous subpoena proceedings is attached hereto as **Exhibit D**.  As shown in that PACER report, Rightscorp began initiating these miscellaneous actions on February 27, 2014, and has continued to file multiple new miscellaneous actions every month since then.

41.     On information and belief, each of the other miscellaneous actions initiated by Rightscorp in the Central District of California, including the actions listed in Exhibit D, are the same as the Greenfield subpoena action, in the following ways: (i) they all utilize the same or similar set of papers (Exhibits A to C), filed by Mr. Hawk on behalf of Rightscorp and its clients, excepting the different ISPs to which the subpoenas are directed; (ii) like Greenfield, each of the other ISP subpoena recipients are also smaller to medium sized ISPs; (iii) as in the Greenfield action, no adversary ever appeared in this Court to contest the subpoena or any other issues; (iv) as in the Greenfield action, no Judge of this Court was ever assigned to review the subpoenas (all the case numbers have a "UA" suffix); rather, the deputy clerk stamped the subpoena upon filing of the action, and the action was closed shortly thereafter; (v) as in the Greenfield action, the clerk-stamped subpoena recites that it is accompanied by an Exhibit A thereto, but no Exhibit A was e-filed on the Court's docket as an attachment to the subpoena.

42.     Rightscorp served the clerk-stamped subpoena, Exhibit C, on Greenfield, and Greenfield made a return on the subpoena to Rightscorp, thus providing personally identifiable information about the subscribers and transactional

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

information about their Internet accounts to Rightscorp.  The total number of Greenfield subscribers who were targeted by the Greenfield subpoena and who were identified by Greenfield is presently unknown to Plaintiff, because there was no Exhibit A to the subpoena filed on the public docket.

43.     On information and belief, each of the 142 ISPs targeted in the miscellaneous actions listed in Exhibit D have also been served by Rightscorp with clerk-stamped subpoenas issued to them, and some of these ISPs (exactly which ones is presently unknown to Plaintiff) have made returns on those subpoenas, thus providing personally identifiable information about the subscribers and transactional information about their Internet accounts to Rightscorp.

44.     On information and belief, Rightscorp's miscellaneous court actions that it used to issue 142 subpoenas, as identified in Exhibit D, have sought to obtain personally identifiable information and Internet transaction information for what probably totals, in aggregate, at least several thousand Internet subscribers, given all of the different ISPs targeted by Rightscorp with subpoenas.  The total number of ISP subscribers targeted by Rightscorp in this manner may well exceed one hundred thousand people.

**(b)     All Of Rightscorp's 142 DMCA Subpoenas Are Invalid; Rightscorp has Conceded This Point and Declined to Argue for a Change in the Law Twice, But Nevertheless Continued to Issue New DCMA Subpoenas Here**

45.     Like Greenfield, Grande Communications Networks, LLC ("**Grande**") was another of the many smaller to medium sized ISPs that was served with a 512(h) subpoena issued by Rightscorp on this Court's authority.  Exhibit D at p. 3 (C.D. Cal. No. 14-mc-627-UA).

46.     On September 5, 2014, Grande, which is based in Texas, through counsel who routinely represents larger national ISPs, moved to quash Rightscorp's 512(h) subpoena in the Western District of Texas.  *In re Subpoena Issued to Grande Comm'n. Net's., LLC*, W.D. Tx. No. 1:14-mc-00848, ECF No. 1, 9/5/14.

-13-

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

47.     Grande argued convincingly in its motion to quash Rightscorp's section 512(h) subpoena as follows,

"It has been well-established for a decade that subpoenas may not be issued under 17 U.S.C. § 512(h) to ISPs merely acting as conduits for electronic communications. *In re Charter Commc 'ns, Inc.*, 393 F.3d 771, 776-78 (8th Cir. 2005) (finding that Section 5 12(h) does not authorize the issuance of subpoenas to ISPs acting as mere conduits for communications between Internet users and vacating order issued by district court enforcing improperly issued Section 512(h) subpoenas); *Recording Indus. Assoc. of Am. v. Verizon Internet Svcs., Inc.*, 351 F.3d 1229, 1236-39 (D.C. Cir. 2003) (Section 512(h) inapplicable where Internet service provider acted as conduit for alleged peer-to-peer file sharing between Internet users).

As the federal courts have explained, any request for the issuance of a subpoena under Section 512(h) must include a copy of a notification of claimed infringement" that must have been sent to the service provider, which notification must include: "Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material." 17 U.S.C. § 51 2(c)(3)(A), (h)(2)(A) (requiring "a copy of a notification described in subsection (c)(3)(A)" as a prerequisite to the issuance of a subpoena under Section 5 12(h)). This requirement plainly contemplates a situation where accused material is stored by a service provider in such a way that a copyright holder may notify such service provider of the accused infringing material and the location of that material, and the service provider may then remove the accused material or block access to the accused material. 17 U.S.C. § 512(c), (h).

The Section 512 notification-and-takedown process is inapplicable as to a conduit ISP, because the ISP could never "locate" a file that does not reside on its systems but rather was merely transmitted by the ISP. The "notifications" that Rightscorp presumably filed in this action are invalid, never resulted in any notice to subscribers, and could not serve the function required by the statute, as the courts have also explained. *See In re Charter Commc 'ns*, 393 F.3d at 777; *Verizon Internet Svcs.*, 351 F.3d at 1235-36 ("any notice to an ISP concerning its activity as a mere conduit does not satisfied the condition of § 51 2(c)(3)(A)(iii) and is therefore ineffective").

-14-

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

The reasoning of the federal appellate courts in *In re Charter* and *Verizon* has been uniformly adopted in the federal district courts. *See, e.g,* Order Granting in Part Mot. For Expedited Disc. and for Extension of Time to Serve Defs., at 2 n.1, *Combat Zone Corp. v. John/Jane Does 1-2*, 12-cv-0142 (N.D. Miss. Dec. 6, 2012), ECF No. 18 (noting that the issuance of a §512(h) subpoena to an ISP acting as a conduit is not supported by the statute);[3] *Interscope Records v. Does 1-7*, 494 F.Supp.2d 388, 391 (E.D. Va. Jul. 12, 2007); *In re Subpoena to University of North Carolina at Chapel Hill*, 367 F.Supp. 2d 945, 952-56 (M.D.N.C. 2005) (providing extensive statutory analysis); *see also Maximized Living, Inc. v. Google, Inc.*, No. 1 1-cv-80061, 2011 WL 6749017, at *5..*6 (N.D. Cal. Dec. 22, 2011) (explicitly agreeing with the D.C. Circuit's decision in Verizon). Grande is not aware of any case law since the In re Charter and Verizon decisions that would support Rightscorp's issuance of a subpoena under 17 U.S.C. § 5 12(h) to an ISP acting as a mere conduit.

Because the Subpoena may not be properly issued to Grande under 17 U.S.C. § 512(h), it should be quashed as unduly burdensome, even without regard to the actual amount of burden that would be involved in complying. *See AF Holdings, LLC* [*v. Does 1-1,058*], 752 F.3d [990,] 995 (D.C. Cir. 2014) (where a subpoena "compels disclosure of information that is not properly discoverable, then the burden it imposes, however slight, is necessarily undue: why require a party to produce information the requesting party has no right to obtain?"); *cf Compaq Computer Corp. v. Packard Electronics, Inc.*, 163 F.R.D. 329, 335-36 (N.D. Cal. 1995) (noting that, "if the soughtafter [discovery is] not relevant nor calculated to lead to the discovery of admissible evidence, then *any burden whatsoever* imposed upon [a third party] would be by definition 'undue.") (emphasis in original).

*In re Subpoena Issued to Grande Comm'n. Net's.*, LLC, W.D. Tx. No. 1:14-mc-00848, ECF No. 1, 9/5/14 at pp. 4–6 (Grande's motion to quash).  Grande also made other arguments about the burden of compliance, and lack of compliance with other legal requirements.

48.    One business day after Grande's foregoing motion to quash was filed, Rightscorp withdrew its subpoena to Grande, via email.  *See id.* at ECF No. 3-1,

---

[3] A copy of the *Combat Zone* decision was attached as an Exhibit to the ISPs motion to quash.

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

9/10/14 (copy of the 9/8/14 email from Mr. Hawk withdrawing the subpoena). Mr. Hawk explained to Grande's attorney that,

> "We are in receipt of your recent filing in Texas. Although we have had considerable success in obtaining compliance by ISP's across the country, it appears that you will counsel your clients to deny our client's requests which we believe are in full compliance with the DMCA. Accordingly, we will seek alternative remedies available to our client and hereby formally withdraw our subpoena.
>
> Any questions, please feel free to contact our office." *Id*.

49.    On September 10, 2014, Grande then filed an advisory to the Western District of Texas, explaining that Rightscorp had "made a hasty retreat" by withdrawing the subpoena via the above-described email, which was attached to the advisory as an exhibit. *Id*. at ECF No. 3, 9/10/14.  Grande's advisory further noted that,

> "Under the circumstances, this Court or the U.S. District Court for the Central District of California may consider ordering Rightscorp and its counsel to show cause why they should not be sanctioned for misusing the federal court's subpoena powers.
>
>    . . . If Rightscorp believed it had a good faith basis for the Subpoena, it would have asserted its position before [the Texas] Court.[4]
>
>    But Rightscorp must know that its position and practice would not survive judicial review. If Grande had not challenged the Subpoena, Rightscorp would have improperly obtained the personally identifiable information of hundreds (or thousands) of Texas Internet subscribers using an invalid procedure, without the notice to any of them that would have followed from the court order that Rightscorp refused to seek to obtain, and without the slightest requirement of any showing to the California court whose signature Rightscorp improperly utilized.
>
>    It appears clear that Rightscorp and its counsel are playing a game without regard for the rules, and they are playing that game in a

---

[4] As Grande argued in a footnote: "In all likelihood, if asked, Rightscorp and its counsel would not be able to identify a single instance in which they argued to a court in an adversarial proceeding that any of the numerous subpoenas issued by them to Internet service providers acting as a conduit is proper under 17 U.S.C. § 512(h)."

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

manner calculated to avoid judicial review. Hopefully, they will not be permitted to continue much longer." *Id*. at pp. 2–3.

50.    As detailed in <u>Exhibit D</u>, since beating the hasty retreat out of Texas on September 8, 2014 while being accused of sanctionable conduct in the issuance of 512(h) subpoenas, Mr. Hawk, on behalf of Rightscorp and its unidentified clients, continued issuing new Section 512(h) subpoenas out of the Central District of California.  Indeed, as indicated on <u>Exhibit D</u>, dozens of new Section 512(h) subpoenas were issued by Rightscorp out of the Central District of California to various different ISPs after September 15, 2014.

51.    It further appears that Grande's fairly recent motion to quash a Rightscorp Section 512(h) subpoena is not the only instance of an ISP challenging a Rightscorp subpoena, only for Rightscorp to then give up without attempting to justify itself in a signed court pleading.  The first entry on <u>Exhibit D</u>, unlike all of the other entries which are from 2014, is *Telscape Comm's, Inc. v Rightscorp, Inc.*, 2:2012-cv-8833-JSF-(JCGx).  A review of that docket reveals that on October 15, 2012, Telscape Communications, Inc. ("**Telscape**") filed a motion to quash a Rightscorp Section 512(h) subpoena, raising many of the same arguments made more recently by Grande.  *Id*. at ECF No. 1.  Rightscorp failed to file an opposition, so, on November 8, 2012, Judge Fischer issued an order in which the Court "deem[ed] the lack of opposition to be consent to the motion," and thus granted Telscape's motion to quash.  *Id*. at ECF No. 12.

52.    On information and belief, like Grande and Telscape, every ISP listed in <u>Exhibit D</u> was acting merely as a "conduit" for the allegedly infringing data at issue such that issuing a Section 512(h) subpoena to each such ISP was legally invalid and a sham.   Accordingly, Mr. Hawk, Rightscorp and the Management Defendants (two of whom are lawyers) have known that it was objectively baseless to rely on Section 512(h) to issue these subpoenas, for the reasons explained by Grande and Telscape in their motion to quash, yet they have continued to issue them.

-17-

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

**(c)      Rightscorp Obtained John Blaha's Contact Information Using An Invalid DMCA 512(h) Subpoena And Then Began Repeatedly Robo-Calling and Texting Mr. Blaha's Cell Phone Over A Period Of Several Months**

53.     Defendant John Blaha subscribes to residential Internet service through an ISP called Imon Communications LLC ("**Imon**").

54.     On information and belief, in or around early April of 2014, Rightscorp forwarded certain email notices of infringement to "Ed.Smith@imon.net."  These notices were in the form of the "Sample Settlement Offer" taken from the Rightscorp investor presentation, as described above.

55.     On May 7, 2014, Mr. Hawk, "on behalf of Rightscorp and the copyright owners it represents," filed paperwork with the U.S District Court for the Central District of California so as to issue a DMCA section 512(h) subpoena to Imon.  *In Re: Subpoena to IMON Communications LLC*, C.D. Cal. No. 2:14-mc-277-UA; *see also* Exhibit D at 2.

56.     On information and belief, Rightscorp did issue a clerk-stamped subpoena to Imon, and, at some point prior to July 2, 2014, Imon made a return on that subpoena and provided Rightscorp with personal and transactional information about Mr. Blaha's Internet account, as well as information about other unnamed class members.  Imon never provided Mr. Blaha and the others with any notice or an opportunity to respond to Rightscorp's DMCA subpoena.

57.     After obtaining Mr. Blaha's contact information in this manner, Rightscorp then used a pre-recorded message, artificial voice, and/or a system capable of auto-dialing numbers, to make repeated robo-calls to Mr. Blaha's cell phone.  For example, Mr. Blaha repeatedly received a message, in what sounded like an artificial or pre-recorded voice, which stated:

> "This is an urgent message from Rightscorp regarding your Internet account.  We have evidence that one or more of our clients' copyrighted materials has been illegally distributed through your Internet connection in violation of U.S. Federal Law 17 U.S.C. 106.  To

-18-

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

settle this urgent matter you can reach one of our agents by pressing any number on your phone keypad now.  Or, you can call us at 888-851-3801 between 8 a.m. and 8 p.m. Pacific Standard Time.  This urgent message is from Rightscorp."

58.　Mr. Blaha also received many other calls from Rightscorp to his cellular phone that said similar things, both from what sounded like human collections agents, as well as the same automated message.  The robo-calls to Mr. Blaha's cell phone continued at the interval of around once per day starting in approximately early July of 2014, and continued at about that frequency for around two months, but then tapered off to more like one or two per week through October of 2014.  These calls came in from a variety of different numbers, from different area codes all over the country.

59.　At certain times, Rightscorp also utilized a slightly different robo-caller message, which Mr. Blaha also received multiple times to his cell phone.  It stated, in what sounds like an artificial or prerecorded voice:

"[Artificial chime] Hello this message is from Rightscorp, notifying you that you have one more copyright infringements.  Please call us at 310-751-7510 between 8 am and 8 pm Pacific Time.  Again that number is 310-751-7510.  This message is from Rightscorp. [*Message, including the artificial chime, repeats in full one more time*]."

60.　On information and belief, Rightscorp obtained Mr. Blaha's cellular telephone number via the invalid subpoena to Imon, and then began attempting to contact him repeatedly at that number, even though Rightscorp *knew* it was a cell phone number.

61.　In addition to the voice Robo-Calls, Rightscorp also sent Mr. Blaha text messages to his cellular telephone, indicating that Rightscorp knew it was attempting to contact a cellular telephone.  For example, on August 28, 2014, Rightscorp sent a text message to Mr. Blaha's cellular telephone, which stated,

"(1/2) URGENT: Your internet service could be interrupted due to copyright infringement.  Please call or text (424) 248-7510 immediately

-19-

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

> to resolve this issue. -
> CB#: 2487510
> 16:06
> (2/2) Rightscorp
> 16:06"

62.     Rightscorp later sent an essentially identical text message to Mr. Blaha's cellular telephone, from the same number, on October 1, 2014.

63.     A true and correct copy of a screenshot from Mr. Blaha's phone showing the unsolicited and unconsented text messages he received from Rightscorp is attached hereto as **Exhibit E**.

64.     Mr. Blaha never gave "prior express consent" to receive autodialed, prerecorded or artificial voice calls or text messages from Rightscorp to his cellular phone.  Further, Mr. Blaha never provided his cellular telephone numbers to the copyright owner creditors who Rightscorp purports to represent in connection with any underlying transaction.

**(d)     Class Action Allegations**

65.     Mr. Blaha brings the TCPA claims on behalf of a class of others similarly situated and defines the class as follows (the "**TCPA Class**"):

> All natural persons residing in the United States, who, during the period four years prior to the date of filing this action, Rightscorp called or caused to be called at their cellular telephone number(s), using: (i) an artificial or pre-recorded voice; and/or (ii) equipment with the capacity to dial numbers without human intervention.
>
> Excluded from this class are Defendants, any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, and Defendants' agents, legal representatives, predecessors, successors, assigns, and employees. Also excluded from the class are the judge and staff to whom this case is assigned, and any member of the judge's immediate family.

66.     Mr. Blaha brings the Abuse of Process claims on behalf of a class of others similarly situated and defines the class as follows (the "**Abuse of Process Class**"):

-20-

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

All natural persons residing in the United States who, during the period two years prior to the date of filing this action, were the target of a subpoena to their ISP, ostensibly authorized under 17 U.S.C. § 512(h), issued by Rightscorp, including each of those subpoenas listed in <u>Exhibit D</u> attached hereto, and their personal or transactional information was disclosed by their ISP to Rightscorp in connection such a subpoena.

Excluded from this class are Defendants, any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, and Defendants' agents, legal representatives, predecessors, successors, assigns, and employees. Also excluded from the class are the judge and staff to whom this case is assigned, and any member of the judge's immediate family.

67.   <u>Numerosity</u>.  For each of the classes, i.e., the TCPA Class and the Abuse of Process Class (together, the "**Classes**"), there are so many members of each class that joinder of all members of that class is impracticable.  On information and belief, there are likely at least one thousand members of each of the Classes.

68.   <u>Commonality</u>.  Common questions of fact and law exist as to all members of the Classes and predominate over questions affecting only individual members of the Classes.  The predominant questions include:

(a)   Whether Rightscorp's telephone system constituted an "automatic telephone dialing system" under the meaning of 47 U.S.C. § 227(a)(1);

(b)   The manner in which Rightscorp obtained the class members' cellular telephone numbers;

(c)   Whether Rightscorp's Robo-Caller system violated the TCPA;

(d)   Whether and to what extent the "clients"/creditors who hired Rightscorp as their "DMCA Agent," on whose behalf Rightscorp purported to be acting, are liable under the TCPA for Rightscorp's unlawful phone calls;

(e)   Whether Rightscorp's issuance of special DMCA subpoenas to various ISPs, ostensibly per 17 U.S.C. § 512(h), was a willful and improper use of the legal process done for an improper purpose; and

(f)   Whether and to what extent the "clients"/copyright owners who

-21-

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

hired Rightscorp as their "DMCA Agent," on whose behalf Rightscorp purported to be acting, are liable on the abuse of process claim against Rightscorp.

69.    <u>Typicality</u>.  Mr. Blaha's claims are typical of the claims of the other members of the TCPA Class and the Abuse of Process Class.  Mr. Blaha is not different in any relevant way from any other members of each of the respective Classes he represents, and the relief sought is common to each Class member.

70.    <u>Adequate Representation</u>.  Mr. Blaha has agreed to and will fairly and adequately represent and protect the interests of the other members of the Classes. Mr. Blaha's interests do not conflict with the interests of the other members of the Classes.  Mr. Blaha has retained counsel who are competent and experienced in complex class actions, and who are knowledgeable about copyright enforcement and the DMCA.

71.    <u>Rule 23(b)(2) Certification: Injunctive Relief</u>.  As required by Fed. R. Civ. P 23(b)(2), the Classes are appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as wholes. The policies of the Defendants challenged herein apply and affect members of the Classes uniformly, and Plaintiff's challenge of these policies hinges on Defendants' conduct, not on facts or law applicable only to Plaintiff.  Further, Defendants continue to engage in the improper practices discussed above. Injunctive relief is necessary and appropriate to enjoin Defendants' conduct and to prevent irreparable harm to Plaintiff and the members of the Classes for which they have no adequate remedy at law.

72.    <u>Rule 23(b)(3) Certification: Predominance and Superiority</u>.  As required by Fed. R. Civ. P. 23(b)(3), the Classes alleged in this Complaint are appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by each member of the Classes will likely be relatively small,

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for members of the Classes to individually obtain effective relief from Defendants' misconduct. Even if members of the Classes themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this complaint. By contrast, class actions present far fewer management difficulties and provide the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

73.   <u>Nature of Contemplated Notice to Proposed Class</u>.   The proposed class may be contacted by email, using the same email addresses utilized by Rightscorp, and/or by mail, using the mailing addresses utilized by Rightscorp and the various ISPs.  In addition, more detailed notice and information can be provided using a website created for the purpose of allowing putative class members to learn about the case and consider their options.  The details of the form of notice, as well as any procedures necessary to ensure appropriate claim administration, will be further explained in connection with class certification.

**FIRST CAUSE OF ACTION**

**Violations of the Telephone Consumer Protection Act (47 U.S.C. § 227)**

**By Mr. Blaha Individually And On Behalf of the TCPA Class**

**Against Rightscorp, the Management Defendants, and the Rightscorp Clients**

74.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

75.   As relevant here, the TCPA prohibits Defendant from making telephone calls "using any automatic telephone dialing system or an artificial or prerecorded

-23-

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

voice … to any telephone number assigned to a … cellular telephone service….” 47 U.S.C. § 227(b)(1)(A)(iii).

76.     “Automatic telephone dialing system” refers to any “equipment which has the capacity … (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.” 47 U.S.C. § 227(a)(1). The FCC, charged with adopting rules implementing the TCPA, has clarified that an automatic telephone dialing system (“**ATDS**”) includes predictive dialers and any other equipment that has “the *capacity* to dial numbers without human intervention.” *See* <u>Meyer v. Portfolio Recovery Assocs., LLC</u>, 707 F.3d 1036, 1043 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2361 (May 13, 2013) (quoting <u>*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*</u>, 18 FCC Rcd. 14014, 14092, ¶ 132 (2003) (“2003 FCC Order”)) (emphasis in original).

77.     Rightscorp used an artificial and/or prerecorded voice, such as those calls described above, in calls made to the cellular telephones of Mr. Blaha and the other members of the TCPA Class.

78.     On information and belief, Rightscorp caused ATDS equipment to be used to make voice telephone calls to the cellular telephones of Mr. Blaha, and the other members of the TCPA Class.

79.     As recently stated by the Ninth Circuit, “[i]t is undisputed that a text message constitutes a call for the purpose of this section” *i.e.*, for the purposes of 47 U.S.C. § 227(b)(1)(A)(iii). <u>Gomez v. Campbell-Ewald Co.</u>, 768 F. 3d 871, 874 (9th Cir. 2014); *citing* <u>Satterfield v. Simon & Schuster, Inc.,</u> 569 F.3d 946, 952 (9th Cir. 2009) (“[W]e hold that a text message is a ‘call’ within the meaning of the TCPA.”).

80.     On information and belief, Rightscorp has also caused ATDS equipment to be used to send text message “calls,” such as those text message “calls” pictured in <u>Exhibit E</u>, to the cellular telephones of Mr. Blaha and the other members of the TCPA class.

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

81.     Rightscorp has, therefore, violated Section 227(b)(1)(A)(iii) of the TCPA.

82.     As a result of Rightscorp's conduct and pursuant to Section 227(b)(3)(B) of the TCPA, Mr. Blaha and the other members of the TCPA Class were harmed and are each entitled to a minimum damages of $500.00 for each unlawful voice call or text message. 47 U.S.C. § 227(b)(3)(B).

83.     Under the TCPA, "if the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times" the baseline figure of $500 in damages for each TCPA violation.  47 U.S.C. § 227(b)(3).  As relevant to the TCPA, "the term 'willful,' when used with reference to the commission or omission of any act, means the conscious and deliberate commission of such act, irrespective of any intent to violate the provision of this chapter."  47 U.S.C. § 312(f)(1).

84.     Rightscorp consciously and deliberately used an artificial and/or prerecorded voice, and caused ATDS equipment to be used to send voice or text calls to the cellular telephones of Mr. Blaha and the other members of the TCPA Class, such that damages should be trebled to $1,500 per unlawful voice or text call. 47 U.S.C. § 227(b)(3).

85.     On information and belief, Rightscorp's unlawful voice and text calls to cell phones were ongoing as of the time the original complaint was filed in this action.

86.     Plaintiff brings this action as private attorneys general, and to vindicate and enforce an important right affecting the public interest. Plaintiff is therefore entitled to an award of attorneys' fees under Code of Civil Procedure section 1021.5 for bringing this action.

87.     On information and belief, each of the Management Defendants manage and work at Rightscorp and had direct personal participation in or

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

personally authorized the actions by Rightscorp that violate the TCPA.  *See* _Jackson's Five Star Catering, Inc. v. Beason_, No. 10-CV-10010, 2012 WL 3205526, at *6 (E.D. Mich. July 26, 2012) ("many courts have held that corporate actors can be individually liable for violating the TCPA 'where they 'had direct, personal participation in or personally authorized the conduct found to have violated the statute.''"); *quoting, inter alia,* _Texas v. Am. Blastfax_, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001).

88.    The Rightscorp Clients are all "clients" of Rightscorp, on whose behalf Rightscorp was acting as a "DMCA Agent", when Rightscorp made the voice and text calls that are unlawful under the TCPA.  Rightscorp was acting as the actual and ostensible agents of the Rightscorp Clients, who were the principals and creditors on the alleged debt or claim that Rightscorp was trying to collect, in making the unlawful phone calls.  Under the TCPA, "a creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation." _In re Rules & Reg's Implementing the Tel. Consumer Prot. Act of 1991_, 23 FCC Rcd. 559 ¶ 10 (December 28, 2007) ("2008 FCC Order"); *see also* _Hartley-Culp v. Green Tree Servicing, LLC_, 2014 U.S. Dist. LEXIS 145851, 6-7 (M.D. Pa. Oct. 10, 2014) (citing 2008 FCC Order and concluding that Fannie Mae was directly liable for TCPA violations committed on its behalf and citing cases holding traditional vicarious liability is also possible under TCPA); *citing, inter alia,* _Thomas v. Taco Bell Corp._, 879 F. Supp. 2d 1079, 1084 (C.D. Cal. 2012) (vicarious liability available under TCPA); *accord* _Gomez v. Campell-Ewald Co._, 768 F.3d 871 (9th Cir. 2014), (holding that third-party marketing consultant who did not actually make any calls was vicariously under principles of agency).  Accordingly, the Rightscorp Clients are vicariously liable as principals for any damages caused by their actual and ostensible agent Rightscorp.

89.    In the alternative, in doing the wrongful acts alleged in this complaint, each of the Rightscorp Clients conspired with and acted in concert with Rightscorp

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

and the Individual Defendants.  Specifically, on information and belief, each Rightscorp Client was aware that Rightscorp was making unlawful cellular telephone calls; agreed with and intended that Rightscorp make such phone calls; and they ordered, directed and authorized Rightscorp's efforts in this regard. Accordingly, each of the Rightscorp Clients is jointly and severally liable for all of the unlawful conduct committed by Rightscorp and the Individual Defendants.

90.     In the alternative to the vicarious liability each of the Rightscorp Clients has incurred due to the acts of their agent Rightscorp, and the joint and several liability they each incurred due to concerted action with Rightscorp, each Rightscorp Client is also liable to the Plaintiff for a contribution in proportion to that Rightscorp Client's respective market share of Rightscorp's overall business.

91.     WHEREFORE, on this cause of action, Mr. Blaha individually and on behalf of the TCPA Class, prays for statutory damages in the amount of at least $500 per violation of the TCPA, trebled to $1,500 per violation, because the unlawful calls were "knowing or willful"; restitution; plus attorney's fees and costs; for preliminary and permanent injunctive relief to stop Rightscorp from further TCPA violations; and for such other relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION

**Abuse of Process (Under Federal and California Law)**

**By Mr. Blaha Individually And On Behalf of the Abuse of Process Class**

**Against All Defendants**

92.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

93.     Dennis Hawk averred in his sworn declarations that he used to obtain the 142 DMCA subpoenas listed in Exhibit D that he was "authorized to act on behalf of Rightscorp and the copyright owners it represents on matters involving infringement of their copyrighted sound recordings."  The issuance of these clerk-

-27-

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

stamped subpoenas from this Court after filing a miscellaneous DMCA action constitutes a use of the legal process.

94.   Mr. Hawk, acting on behalf of both Rightscorp and the Rightscorp Clients, intentionally used the special DMCA subpoena procedure to issue subpoenas that are invalid.  Mr. Hawk did this for an improper purpose, namely to obtain personally identifiable information for members of the Abuse of Process Class, that Rightscorp could then use as grist for its national "settlement" mill.  On information and belief, Mr. Hawk and the Management Defendants knew before they began issuing them that the subpoenas were legally invalid because the ISPs they were issuing them to were "merely conduits" as defined under all of the applicable law interpreting the DMCA.  As detailed above, on at least two occasions (once in 2012 before this Court and again in Texas in 2014) when Rightscorp was formally challenged as to the legality of its DMCA subpoenas, Rightscorp retreated and declined to argue for a change in the law.  Nevertheless, Rightscorp continued to issue DMCA subpoenas, despite tacitly acknowledging that such subpoenas are not allowed under the current law and despite declining, twice, to argue that the law should be changed.

95.   Mr. Blaha and the other members of the Abuse of Process Class were harmed by Mr. Hawk and Rightscorp's abuse of the legal process.  Their personal information was released by their ISPs to Rightscorp, resulting in harm as defined by TCPA, and in them receiving a barrage of harassing and unlawful communications via phone, email and mail, and which was distressing and annoying.  In addition, transactional information about their Internet accounts was improperly disclosed to Rightscorp, which violated their rights of privacy.

96.   Mr. Hawk's issuance of the legally invalid DMCA subpoenas was a substantial factor in causing the harm to Mr. Blaha and the other members of the Abuse of Process Class.

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

97.     The legal basis for the DMCA subpoenas issued by Rightscorp, including all of the subpoenas listed on <u>Exhibit D</u>, was objectively baseless in the sense that no reasonable litigant in Rightscorp's position could expect success on the merits.  Further, Mr. Hawk, the Management Defendants, and Rightscorp also had an improper subjective, ulterior purpose in issuing the DMCA subpoenas, which was to try and obtain information it could use to leverage "settlements" of claims that none of them had any right to bring in the first place.  The objective lack of merit to Rightscorp's position on the DMCA subpoenas was compounded by the fact that when Rightscorp was presented with two different opportunities to potentially argue for a change or extension of the law, it declined to attempt to make such an argument, but then kept on issuing subpoenas it knew were invalid under existing law.

98.     Mr. Hawk, Rightscorp, and the Management Defendants acted with oppression fraud and malice in abusing the legal process.  Accordingly, Mr. Blaha and the other members of the Abuse of Process Class are entitled to exemplary and punitive damages.  Cal. Civ. Code § 3294.

99.     Since Mr. Hawk purported to be and was ostensibly acting as an agent not only on Rightscorp's behalf, but also on behalf of undisclosed "client" principals, when he issued the invalid subpoenas, both Rightscorp and the Rightscorp Clients are vicariously liable for the torts of their ostensible agent, Mr. Hawk.  On information and belief, Mr. Hawk was also the actual agent of the Rightscorp Clients, so the Rightscorp Clients are also vicariously liable for Mr. Hawk's torts for that reason as well.  In addition, the Rightscorp Clients are also vicariously liable for the torts of their actual and ostensible agent Rightscorp, who Mr. Hawk was directly representing in abusing this Court's legal subpoena process.

100.   In the alternative, in doing the wrongful acts alleged in this complaint, each of the Defendants conspired together and acted in concert with one another.  Specifically, on information and belief, each of the Defendants was aware that

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Rightscorp was issuing DMCA subpoenas on behalf of the Rightscorp Clients; agreed with and intended that Rightscorp issue such subpoenas; and ordered, directed and authorized Rightscorp's efforts in this regard.   Accordingly, each Defendant is jointly and severally liable for all of the unlawful conduct committed by any of the other conspiring Defendants in relation to the issuance of the DMCA subpoenas.

101.   In the alternative to the vicarious liability each of the Rightscorp Clients has incurred due to the acts of their agents Rightscorp and Mr. Hawk, and the joint and several liability they each incurred due all Defendants concerted action, each Rightscorp Client is also liable to the Plaintiff for a contribution in proportion to that Rightscorp Client's respective market share of Rightscorp's overall business.

102.   WHEREFORE, on this cause of action, Mr. Blaha, both individually and on behalf of the Abuse of Process Class, prays for an award of damages and costs, and restitution; as well as punitive and exemplary damages; for preliminary and permanent injunctive relief prohibiting Mr. Hawk and Rightscorp from continuing to issue legally invalid DMCA subpoenas; and for such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF ON COMPLAINT

NOW, THEREFORE, Plaintiff, individually and on behalf of all three Classes, prays that the Court enter judgment in their favor and against Defendants, and issue orders, as follows:

A.   Order certifying each of the Classes, directing that this case proceed as a class action, and appointing Mr. Blaha and his counsel to represent each of the Classes;

B.   Award of damages to Mr. Blaha and the other members of the TCPA Class in an amount between $500 (as a baseline) and $1,500 (upon proof of willful or knowing conduct) per violation of the TCPA, plus restitution, as proven at trial, on the TCPA cause of action;

-30-

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

C.     Award of damages to Mr. Blaha and the other members of the Abuse of Process Class, including punitive and exemplary damages, plus restitution as proven at trial, on the abuse of process cause of action;

D.     Award of attorney's fees and costs to Plaintiff and his counsel on the TCPA cause of action;

E.     Order for preliminary and permanent injunctive relief prohibiting Defendants from continuing to issue legally invalid DMCA subpoenas, ostensibly pursuant to 17 U.S.C. § 512(h), to ISPs that are mere conduits, and from continuing to violate the TCPA, on the TCPA cause of action; and

F.     For such other relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

DATED: March 9, 2015

THE PIETZ LAW FIRM                              ROXBOROUGH, POMERANCE, NYE & ADREANI

*/s/ Morgan E. Pietz*                             */s/ Drew E. Pomerance*

Morgan E. Pietz (SBN 260629)          Drew E. Pomerance (SBN 101239)
THE PIETZ LAW FIRM                              Anne S. Kelson (SBN 257851)
3770 Highland Avenue, Suite 206      Jesse B. Levin (SBN 268047)
Manhattan Beach, CA 90266              ROXBOROUGH, POMERANCE, NYE & ADREANI
mpietz@pietzlawfirm.com                   5820 Canoga Avenue, Suite 250
Telephone: (310) 424-5557                  Woodland Hills, CA 91367
Facsimile:  (310) 546-5301                   dep@rpnalaw.com
                                                             ask@rpnalaw.com
                                                             jbl@rpnalaw.com
                                                             Telephone: (818) 992-9999
                                                             Facsimile:  (818) 992-9991

*Attorneys for Plaintiff John Blaha,*
*individually and on behalf of others similarly situated*

-31-

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**